**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                                  )
UNITED STATES OF AMERICA,                )
                                                                  )
       v.                                                    )
                                                                  )       Criminal No. 14-66 (EGS)
SAENA TECH CORPORATION,                  )
                                                                  )
       Defendant.                                  )
                                                                  )
_____)

## MEMORANDUM OF LAW OF *AMICUS CURIAE* LAW PROFESSOR

### Introduction and Interest of *Amicus Curiae*

      Professor Brandon L. Garrett hereby submits this memorandum, by and through

counsel, Alan B. Morrison, as amicus curiae, pursuant to the Court's July 21, 2014 order.

Professor Brandon L. Garrett is the Roy L. and Rosamund Woodruff Professor of Law at

the University of Virginia School of Law, where he has taught since 2005.  This amicus

brief solely reflects the views of amicus and not those of the University of Virginia.

Amicus' research and teaching interests include criminal procedure, habeas corpus,

corporate crime, scientific evidence, and constitutional law.  Amicus has a professional

research interest in development of the law concerning corporate prosecutions and

corporate prosecution agreements.  Research by amicus examining corporate

prosecutions includes a book forthcoming in Fall 2014 from Harvard University Press,

titled "Too Big to Jail: How Prosecutors Compromise with Corporations."[1]  For several

---

[1] Prior work on the subject of corporate prosecutions includes: Brandon L. Garrett, *Globalized Corporate Prosecutions*, 97 Va. L. Rev. 1775 (2011), Brandon L. Garrett, *Structural Reform Prosecution*, 93 Va. L. Rev. 853 (2007); Brandon L. Garrett, *Corporate Confessions*, 30 Cardozo L. Rev. 917 (2009), and

years amicus has maintained a database of federal prosecution agreements with companies with the University of Virginia Law Library.  That database remains the most complete source for information about federal organizational deferred and non-prosecution agreements,[2] and it accompanies a larger collection of federal corporate convictions.[3]  Amicus has testified before Congress concerning corporate prosecution agreements and served as a reporter on an American Bar Association subcommittee for a task force on corporate monitors.

As described by the Court in the July 21, 2014 order, amicus writes with commentary on the scope of judicial authority, if any, to review the fairness and reasonableness of the deferral of the prosecution of an organization under Title 18, United States Code, Section 3161(h)(2) of the Speedy Trial Act. In the view of amicus, that provision provides a court with clear and express authority to decide whether or not to approve such a deferred prosecution agreement, including with reference to the fairness and reasonableness of its terms.  Amicus agrees with the Government that this constitutes an "important but limited role."  *See* Government's Supplemental Brief Addressing the Scope of the Court's Authority to Consider the Fairness and Reasonableness of a Deferred Prosecution Agreement in Deciding Whether to Accept or Reject the Agreement, August 8, 2014, at p.1 ("Government's Supplemental Brief").  But amicus also believes that the court's role has real substance in order to ensure that the defendant demonstrates good conduct, which in the case of a corporation, may involve

---

"Collaborative Organizational Prosecution," in *Prosecutors in the Boardroom,* ed. Rachel Barkow and Anthony Barkow (New York: New York University Press, 2011).
[2] Brandon L. Garrett and Jon Ashley, Federal Organizational Prosecution Agreements, University of Virginia School of Law, http://lib.law.virginia.edu/Garrett/prosecution_agreements/home.suphp.
[3] Brandon L. Garrett and Jon Ashley, Federal Organizational Plea Agreements, University of Virginia School of Law, http://lib.law.virginia.edu/Garrett/plea_agreements/home.php.

both cooperation and adoption of governance reforms to improve compliance.  Concepts

of fairness and reasonableness are useful in this area, as in others in which courts review

plea agreements and other types of settlements.  In addition, the court possesses

supervisory authority over implementation of the agreement during the time the case

remains on the docket.  These views of amicus reflect law and policy relating to

organizational prosecutions generally, and are not specific to any particulars of this

pending case, although relevant aspects of this case are highlighted.


## ARGUMENT

The sections that follow describe: (I) (a) the text and history of the Speedy Trial

Act itself; (b) unique factors raised in organizational deferred prosecution agreements;

(II) caselaw concerning individualized review of organizational deferred prosecution

agreements; (III) caselaw concerning settlement of complex cases involving

organizations, both (a) criminal and (b) civil, that provide relevant standards that can

inform judicial review over deferred prosecution agreements, and (c) implicating ongoing

supervisory authority of the Court.


**I.  The Speedy Trial Act Provides the Court with Authority to Review Whether to Approve a Deferred Prosecution Agreement**

**A.  The Text and Legislative History of Section 3161(h)(2) Supports Judicial Review of Approval of a Deferred Prosecution Agreement**

The applicable section of the Speedy Trial Act, Section 3161(h)(2), refers to

tolling time for: "Any period of delay during which prosecution is deferred by the

attorney for the Government pursuant to written agreement with the defendant, with the

approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct."  The requirement that a deferred prosecution proceed only upon "the approval of the court," makes the discretion of the court clear.  After all, other provisions of the Act do not require court approval, while still other provisions of the Act limit discretion, for example, by providing factors to be considered when deciding whether to grant a continuance, or by supplying standards for whether a type of delay is reasonable.

Any doubt over the meaning of such provisions should be read in favor of judicial discretion.  The provisions of the Act were generally intended to "strengthen[] the supervision over persons released pending trial," See H.R. Rep. No. 93-1508, at 1 (1974), as reprinted in 1974 U.S.C.C.A.N. 7401, 7401.  Thus, amicus views the initial discretion whether to approve a deferred prosecution as necessarily combined with substantive review of that agreement and as joined with ongoing supervision of such a case.

The Report of the Senate Judiciary Committee on the Speedy Trial Act briefly discussed how several U.S. Attorney's offices had been experimenting with diversion programs, noting a Congressional desire to "encourage" that "current trend," and concluding that the diversion provision "assures that the court will be involved in the decision to divert and that the procedure will not be used by prosecutors and defense counsel to avoid the speedy trial time limits."[4]  That text describing the need for the court to be "involved in the decision to divert," together with the explicit requirement that a judge approve a deferral, makes clear the judge's authority to review and approve such an agreement.

---

[4] S. REP. NO. 93–1021, at 37 (1974); *see also* A. Partridge, *Legislative History of Title I of the Speedy Trial Act of 1974* (Fed. Judicial Center 1980), *at* http://www.fjc.gov/public/pdf.nsf/lookup/lhiststa.pdf/$file/lhiststa.pdf.

In the view of amicus, the court retains unqualified discretion to approve a deferred prosecution agreement or not, just as with a plea agreement.  In that regard, amicus disagrees with the more limited interpretation of the language of Section 3161(h)(2) offered by the Government in certain portions of its submission, suggesting that the sole purpose of the Section is to ensure that the agreement is not purely a vehicle to avoid the time limits in the Act.  In other portions of its submission, with which amicus agrees, the Government states a judge has authority to review whether a deferred prosecution agreement is designed to use the time sought to accomplish the goals of diversion, including to ensure good conduct by the defendant.  See, e.g. Government's Supplemental Brief at 6-7 ("the Court can be satisfied that the parties' agreement to defer prosecution for a period of two years is for the purpose of allowing the company to demonstrate good conduct rather than simply putting off a looming trial date.") The term "good conduct" has a different meaning in the context of an organization, and prosecutors focus not just on recidivism, but on adoption of effective compliance measures.  In addition, as discussed below, there are relevant standards that can inform the discretion that the Speedy Trial Act provides to a court to be drawn from analogous contexts, such as judicial review of plea agreements and civil consent decrees.

**B.  The Unique Context of Organizational Deferred Prosecution Agreements Requires Individualized Review**

While the drafters of the Speedy Trial Act were familiar with the use of diversion or deferred prosecution programs for non-violent or juvenile offenders, modeled on the early "Brooklyn Plan" program to rehabilitate such offenders, corporate deferred prosecution agreements are fairly recent.  There were few such deferred prosecution

agreements with organizations before 2001; amicus has located just fourteen of them.[5]

The use of deferred and non-prosecution agreements in organizational prosecutions has

become quite common over the past decade, however, and not in low level or

misdemeanor cases, but in some of the largest-scale corporate prosecutions ever seen in

this country.  Amicus has collected data on these agreements and tracked their use.  The

cases are often criminal prosecutions of some real importance not just to the parties but

for the public interest.  There have now been over 300 deferred or non-prosecution

agreements with organizations.  Over two-thirds were with public companies; one-fifth

were Fortune 500 and one-fifth were Global 500 firms.[6]  Some of the well-known

companies that have entered such agreements include: AIG, America Online, Barclays,

Boeing, Bristol-Myers Squibb, CVS Pharmacy, General Electric, GlaxoSmithKline,

HealthSouth, JPMorgan, Johnson & Johnson, Merrill Lynch & Co., Monsanto, and Sears.

    In contrast to the deferred prosecution agreement in this case, a non-prosecution

agreement is not filed with a court.  While distinct from a declination, such an agreement

cannot implicate supervisory authority of a court, since the court is not asked to approve

it.[7]  However, a deferred prosecution agreement is filed in court and seeks the approval of

a court, after which the case will remain on the court's docket for a defined period of

time, subject to compliance with the terms of the agreement.  Moreover, deferred

corporate prosecution agreements raise a host of issues that the typical criminal resolution

---

[5] Brandon L. Garrett and Jon Ashley, Federal Organizational Prosecution Agreements, University of Virginia School of Law, http://lib.law.virginia.edu/Garrett/prosecution_agreements/home.suphp (providing a resource website with federal organizational deferred and non-prosecution agreements).
[6] Brandon L. Garrett, *Too Big to Jail: How Prosecutors Compromise with Corporations* Ch. 3 (forthcoming October 2014).
[7] The General Accountability Office has criticized the lack of criteria for deciding whether a company receives a deferred or a non-prosecution agreement.  Government Accountability Office, *Preliminary Observations on the DOJ's Use and Oversight of Deferred Prosecution and Non-Prosecution Agreements,* June 25, 2009, 41.

with an individual does not.  Such agreements typically focus on not just criminal fines, forfeiture, restitution, or community service payments, but also on what amicus has termed "structural reforms" reminiscent of institutional reform in public law litigation. *See* Brandon L. Garrett, *Structural Reform Prosecution,* 93 Va. L. Rev. 853 (2007). These provisions can include detailed compliance programs, such as the hiring of additional compliance personnel, governance changes, and requirements of periodic reporting and evaluation of compliance.  Some agreements require the retention of independent corporate monitors.  Some agreements (very few) call for the court to select or approve the independent monitors. Still additional consequences include parallel settlements and terms requiring compliance with civil regulators, or settlements with private plaintiffs.  Standard agreements require cooperation in investigations of individual employees; the agreements may impact those employees, including if the firm agrees to waive attorney client or work product privilege.  These agreements typically last for just two to three years. The agreements may be negotiated with multiple parties, including prosecutors from multiple offices, a range of regulators, and attorneys representing victims; some involve foreign governments and their prosecutors and regulators.  The agreements may also implicate the criminal procedure rights of individual criminal defendants.[8]

All of these noteworthy features explain why deferred prosecution agreements with organizations involve a court in highly complex settlements of real public importance, raising issues quite different from a typical diversion agreement for a nonviolent first-time offender.

---

[8] U.S. v. Stein, 541 F.3d 130, 136 (2d Cir. 2008); U.S. v. Stein, 435 F.Supp.2d 330, 382 (S.D. N.Y. 2006).

**II. Courts Have Conducted Individualized Review of the Substance of Deferred Prosecution Agreements with Organizations**

Courts have routinely conducted individualized assessments of deferred prosecution agreements with corporations as part of their decision whether to approve such agreements.  In doing so, courts have remained deferential, as with any settlement reached between parties at arms length, but they have nevertheless considered the public interest, reasonableness, fairness, equity, and other factors, in deciding whether to approve such an agreement.  To be sure, corporate deferred prosecution agreements are a fairly recent phenomenon, and the vast bulk of these agreements have been approved, sometimes after hearings, but often without hearings or written decisions.  Yet some courts have issued written decisions explaining the standards applied, particularly in recent years as the practice has become more established.  Those courts have approved the agreements as drafted after conducting such review.  As will be described, such standards are consistent with ensuring that an agreement serves to provide a meaningful opportunity for the defendant to assure the Government of its good conduct.

For example, after conducting two hearings, the court *in U.S. v. WakeMed* stated that "after weighing the seriousness of defendant's offense against the potential harm to innocent parties that could result should this prosecution go forward, the Court has determined that a deferred prosecution is appropriate in this matter."  2013 WL 501784, No. 5:12–CR–398–BO (E.D. North Carolina, February 8, 2013).  The court examined the "equities," and conducted what amounted to a fairness and reasonableness review.  The court concluded the government had demonstrated that "the conduct at issue was serious and in need of being addressed by criminal process," but that the agreement provided for

sufficient fines, cooperation, and monitoring.  The Court also considered the need to

protect WakeMed's patients, as well as "the protection of defendant's employees and

healthcare providers who are blameless but who would suffer severe consequences

should defendant be convicted and debarred as a Medicare and Medicaid provider."  *Id*.

at *2.  The court held that, because "[t]he parties having agreed to periodic review of the

status of this matter by the Court, any reports made relating to defendant's compliance

with the agreement shall be filed with the Court for its review."

Judge Royce C. Lamberth, in approving a deferred prosecution agreement with

Credit Suisse, made the following finding:

> "[T]his Court hereby finds that the period of delay as set forth in Paragraph 5 of
> the written Deferred Prosecution Agreement is for the purpose of allowing
> Defendant CREDIT SUISSE AG to demonstrate its good conduct and implement
> its remedial measures. Accordingly, this Court approves the written Deferred
> Prosecution Agreement."

U.S. v. Credit Suisse AG, 2009 WL 4894467 *1, Criminal No. 09–352 (D.D.C.  Dec. 16,

2009).

Judge John Gleeson, in the most detailed opinion that has addressed the subject to

date, concluded that the judge's role under Section 3161(h)(2) is not simply to assure that

the parties have not colluded to toll the speedy trial clock: "approving the exclusion of

delay during the deferral of prosecution is not synonymous with approving the deferral of

prosecution itself."  Memorandum and Order, United States v. HSBC Bank USA, 2013

WL 3306161 *3, No. 1:12-cr-00763-JG (E.D.N.Y. July 1, 2013) ("HSBC Order"). Judge

Gleeson noted that the Speedy Trial Act is "silent" as to the standard for deciding

whether to approve a deferred prosecution agreement.  As described in the Government's

Supplemental Brief, Judge Gleeson emphasized, apart from the language of the Speedy

Trial Act, the supervisory authority of the court as a basis for the court's active involvement.

In doing so, Judge Gleeson proceeded to examine the terms of the HSBC agreement, and in the process, found the fines, compliance provisions, and other terms to be appropriate.  However, Judge Gleeson found one feature lacking: the court was not to be kept apprised of the agreement's implementation.  He, therefore, ordered the parties to file quarterly reports describing "all significant developments," resolving any "doubts about whether a development is significant ... in favor of inclusion."  *Id.*

Other federal courts have been less fulsome in explaining their approvals: "Pursuant to Title 18 of the United States Code, Section 3161(h)(2) and (8), the ends of justice served by granting the continuance outweigh the best interest of the public and [the company] in a speedy trial."[9]

What subjects might be particularly worthy of judicial scrutiny?  A court would be particularly deferential in reviewing the decision *whether* to offer pre-trial diversion to a defendant; for example, courts have long held that a defendant cannot claim any right to obtain a deferred prosecution settlement.[10]  However, as described, the terms of the agreement itself may raise a range of fairness and reasonableness-related concerns.

---

[9] U.S. v. Zimmer, 2007 WL 2964252, Mag No. 07-8130 (MCA) (D. New Jersey, Sept. 28, 2007); *see also, e.g.* U.S. v. Biomet Orthopedics, 2007 WL 2964201, Mag No. 07-8133 (MCA) (D. New Jersey, Sept. 28, 2007); U.S. v. Wright Medical Technology, Inc., 2010 WL 6606785, Mag. No. 10–8233 (MF) (D. New Jersey, Sept. 30, 2010).  18 U.S.C. § 3161(h)(7) permits a continuance if "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  In his ruling in the HSBC case, Judge Gleeson specifically disagreed that this broad "ends of justice" standard contained in 3161(h)(7) applies in the more specific circumstances of a 3161(h)(2) deferred prosecution, citing to the Supreme Court's opinion in Zednar v. U.S., 547 U.S. 489, 497–99 (2006).

[10] *See, e.g.* United States v. Richardson, 856 F.2d 644, 647 (4th Cir. 1988) ("A defendant has no right to be placed in pretrial diversion. The decision... is one entrusted to the United States Attorney."); United States v. Hicks, 693 F.2d 32, 34 n.1 (5th Cir. 1982), cert. denied, 459 U.S. 1220 (1983)  ("Since pretrial diversion is a program administered by the Justice Department, considerations of separation of powers and prosecutorial discretion might mandate an even more limited standard of review.").

Below is a list of categories for consideration with examples of provisions that may raise fairness or reasonableness concerns.  Factors that might have bearing in the Saena Tech Corp. matter are also noted.

**Fines.**  Agreements that do not impose fines or other penalties at all, or fines or penalties that do not comport with the purposes of the Organizational Sentencing Guidelines or statutory fines provisions may deserve particular scrutiny.  Most deferred prosecution agreements do not include a Sentencing Guidelines calculation or other explanation of the origin of any fine amount or other penalty.  The proposed Saena Tech Corp. agreement is an example; the information and statement of facts describe $250,000 in bribe payments, but not the resulting pecuniary gains to the company from the offenses (or for that matter, additional attempted offenses), or the resulting pecuniary losses and other harm (both to the Government, and perhaps to competitors).  As a result, it is difficult to assess from solely reading the agreement itself whether the $500,000 fine named is a lenient, moderate, or severe fine.  The agreement does specify that the fine is not tax deductible under U.S. law (whether that would similarly be true under Korean law is not stated in the agreement.)

Many agreements provide for no criminal fine at all, sometimes without explanation.  Sometimes the company is understandably given credit for payments to regulators or other prosecutors.  In some cases, the company may be defunct or unable to pay.  However, without explanation, it is difficult to evaluate whether the amounts of penalties are reasonable or fair.  The same concerns can arise in the context of forfeiture, restitution, and other types of payments made in corporate prosecution agreements.

**Compliance.**  Agreements that do not impose compliance terms or supervision of compliance may raise accountability concerns.  Also of concern are agreements that do require that a company make changes to its policies and compliance program, but without clearly explaining what changes are required.  If the sought after good conduct is not spelled out in the deferred prosecution agreement, it is unclear how the government will determine whether the company has demonstrated its good conduct.

In addition, many agreements do not require that compliance be regularly audited or assessed, which the Sentencing Guidelines view as crucial, along with internal whistleblowing or reporting systems.  U.S.S.G. § 8B1.1(b)(5)(A)-(C), (c).  The Guidelines describe in some detail what minimally effective compliance may require, and taking into account the size of the organization.  U.S.S.G. § 8B2.1, and Application Notes.  Accomplishing improvements to compliance is an important goal of a corporate prosecution, but only if that compliance is not "cosmetic," and is carefully assessed and audited to ensure its effectiveness.  The Saena Tech Corp. agreement raises the concern that compliance is not carefully enough defined.   Deferred Prosecution Agreement, U.S. v. Saena Tech Corp, 1:14-cr-00066-EGS, Document 5-1, at 7 (April 16, 2014) ("it will implement a compliance and ethics program designed to prevent and detect violations of the applicable anti-corruption laws throughout its operations").  The company was asked to conduct a review of its compliance and ethics programs, and perhaps that review produced relevant information about not only written corporate policies but effectiveness and implementation.  However, there appear to be no requirements in the agreement itself regarding periodic reporting and assessment of that compliance.

Cases like the Saena Tech Corp. case that involve foreign companies can also potentially raise questions regarding the intersection of compliance with U.S. laws and regulations and foreign corporate governance rules. Some deferred prosecution agreements have even called for the appointment of foreign corporate monitors to help assure that governance changes are suitable to U.S. as well as the foreign country's laws, regulations, and business norms. Prosecutions involving foreign corporations may involve special issues and practical difficulties making settlements particularly desirable, including difficulties in securing access to evidence overseas, challenges faced in extraditing individuals, jurisdictional obstacles to prosecution or the enforcement of judgments, questions of foreign policy, and matters raising diplomatic concerns. *See* Brandon L. Garrett, *Globalized Corporate Prosecutions,* supra, 97 Va. L. Rev. at 1838, 1852-53, 1856.

**Monitors.**  Only one-quarter of deferred and non-prosecution agreements since 2001 call for the appointment of a corporate or independent monitor to supervise compliance, which can provide outside assurance that compliance has been improved. Few agreements call for the court to approve independent monitors. Absent judicial approval, there may be concerns with the selection process for the monitor position. Concerns have also been raised about the terms of retention of monitors, including their pay. Of particular concern, however, are those three-quarters of agreements in which there is no outside monitoring. Some agreements require creation of internal Chief Compliance Officer or other similar positions to ensure that the compliance function is strengthened within the company. Periodic reporting to a court may also provide further assurance that compliance is being effectively improved.

**Cooperation.** Agreements that do not require cooperation, or where the company did not fully cooperate at times prior to settlement, should similarly raise concerns, both as to responsible individuals and the corporation.  Self-reporting by a company can receive and should deserve particular credit, where the conduct might not otherwise have come to the attention of law enforcement.  See, e.g. U.S.S.G. § 8C2.5(g). Initial non-cooperation, in contrast, may not warrant the same treatment.

An agreement that provides some sort of release from prosecution of responsible individuals who might otherwise have been prosecuted may raise concerns.  The proposed Saena Tech Corp. agreement secures, in quite detailed terms, the cooperation of an individual who, according to the Statement of Facts, made the payments in question, but whose cooperation in the larger investigation might otherwise have been practically difficult to obtain. While courts have in rare cases, with examples noted below, rejected organizational plea agreements expressing concern with the non-prosecution of individuals, it is not clear to amicus, who is not closely familiar with the facts of this case, whether this agreement raises such concerns, particularly given potential practical difficulties in securing cooperation from and investigating foreign persons.  The proposed agreement also provides for the full cooperation of the company with all pending investigations by regulators and prosecutors.  The agreement does not require a waiver of work product or attorney client privilege, subjects that have raised judicial concerns in past cases.

**Unrelated Terms.**  I have suggested that imposing substantial, unrelated obligations on an organization as part of a deferred prosecution agreement (such as requiring a charitable contribution unrelated to remedying the harm caused by the crime)

might also deserve judicial intervention. Those terms are now contrary to the Department of Justice's own guidelines and so would not be expected to be included.[11]

**Collateral Consequences.**  For some companies, and in some regulated industries, a conviction could result in suspension or debarment that would have unduly severe consequences for a company.  If a company was debarred from doing work critical to its business, employees and shareholders who did not participate in the wrongdoing could be seriously harmed.  The public might be harmed, if the company provides an important product or service to the public or to the government.  Fairness may sometimes counsel a settlement that avoids such collateral consequences, and such consequences are understandably a factor that prosecutors take great care to consider.  In the Saena Tech Corp. case, debarment from government contracting might be a consequence of a conviction; it is not clear from the agreement whether that was a consideration.  In addition, a deferred prosecution, while not a judgment, may itself result in legal and collateral consequences, providing still additional reasons for a judge to supervise and approve the agreement.[12]

**Victims.**  As noted below, a deferred prosecution agreement avoids participation of victims and notice to victims that might otherwise be required in a criminal case.  The Guidelines prioritizes payment of restitution over fines for organizations.  U.S.S.G. § 8B1.1  Some deferred prosecution agreements provide for restitution to victims, but there is the concern that victims do not participate as they would in a plea proceeding, and

---

[11] *See* U.S. Attorney's Manual*, § 9–16.325 (stating that such agreements should not include terms requiring payments to a person or organization "that is not a victim of the criminal activity or is not providing services to redress the harm caused by the defendant's criminal conduct.").

[12] *See, e.g.* Harmon v. Teamsters, Chauffeurs & Helpers Local Union 371, 832 F.2d 976, 980 (7th Cir.1987) ("We conclude that 'conviction' within the meaning of section 504 includes punishment under the deferred-judgment procedure."); McKinney v. Moore, 2007 WL 1149253 *3, No. 04 Civ. 07926(RCC) (S.D.N.Y. April 16, 2007) ("This deferred prosecution agreement, which contains several remedial and punitive provisions, renders it well within the broad meaning and reading of "conviction.").

cannot raise questions relevant to their interests and also to the public interest.  While the Saena Tech Corp. agreement does not discuss any victims, not only was the government harmed by conduct described in the Statement of Facts, but perhaps competing contractors were also harmed.  Whether restitution would be appropriate or participation by victims is appropriate could be a factor to consider.

**Regulators.**  The goals of regulatory enforcers and the underlying goals of regulatory schemes, where the crime is a provision incorporated into such a scheme, may be highly relevant to evaluating the fairness and reasonableness of a corporate agreement. A criminal prosecution may be the product of a referral by regulators as a particularly serious violation, but one that would otherwise be handled using a civil agreement with a set of compliance terms developed by regulators.  The reasonableness and fairness of agreements with regulatory subject matter may be assessed with reference to the goals and the enforcement outcomes in similar (or parallel) administrative proceedings.  In addition, the views of the referring agency may also be relevant on the reasonableness of the agreement.

**Delay.**  The period of delay during a deferred prosecution agreement may itself be prejudicial to certain types of interests and worth examining in certain cases.  During that time, statutes of limitation to pursue charges against individual officers or employees may expire.  As a result, cooperation of the company during that time may be important.

In general, an organizational prosecution agreement anticipates a range of future conduct that itself may implicate judicial supervision.  That a judge would require certain assurances that good conduct will result from an agreement, before approving such an

agreement to delay litigation, and that a judge would retain authority to supervise a case

on the docket, seems quite uncontroversial.

### III.   Review of Organizational Deferred Prosecution Agreements Should Draw on Criminal and Civil Analogies for Fairness and Reasonableness Reviews of Settlements

### A. Review of Plea Agreements is Similarly Left to the Discretion of the Judge, Caselaw Concerning Corporate Plea Agreements Provides Analogous Standards

The provisions of Fed. R. Crim. P. 11, including the procedures for advising the

defendant and developing the factual basis and voluntariness of the plea on the record set

out in Rule 11(b), do not literally apply in the case of a deferred prosecution agreement.

However, the standards for plea agreement approval should inform the approval of

deferred prosecution agreements: under Rule 11, the court has discretion whether to

accept or reject the plea, or defer a decision.  Fed. R. Crim. P. 11(c)(3)(A).  Thus, much

as the Speedy Trial Act simply states that a judge may approve a deferred prosecution

agreement, "[t]he plea agreement procedure does not attempt to define criteria for the

acceptance or rejection of a plea agreement. Such a decision is left to the discretion of the

individual trial judge." Fed.R.Crim.P. 11(e), advisory committee note; *Santobello v. New*

*York,* 404 U.S. 257, 262 (1971) ("A court may reject a plea in exercise of sound judicial

discretion.").

Factors that courts have elaborated to inform that discretion in the plea bargaining

context should carry weight in the deferred prosecution context. Judges may generally

reject plea agreements "when the district court believes that bargain is too lenient, or

otherwise not in the public interest."[13]  Other factors that the court may consider include

whether the anticipated sentence would be appropriate.[14] To be sure, the role of a judge is

deferential. As the Supreme Court has put it, a range of factors, such as "the

government's enforcement priorities . . . are not readily susceptible to the kind of analysis

the courts are competent to undertake." *Wayte v. United States*, 470 U.S. 598, 607 (1985).

Criminal settlements involving organizations raise distinct issues regarding

enforcement priorities, third parties, regulators, ongoing supervision, and the separate

Organizational Sentencing Guidelines.  As a result, courts have conducted individualized

assessments in corporate plea agreements in the past.  In doing so, they have considered

fairness, reasonableness, and the public interest.

For example, a federal court has rejected, as contrary to the "public interest," a

corporate plea agreement.[15]  Another corporate agreement was delayed while the court

considered objections by victims, but it was eventually approved as consistent with the

public interest.[16] The Tenth Circuit approved the district court's rejection of a plea

agreement due to the fact that the corporation would have paid a fine but immunity would

have been given to a culpable individual.  *Carrigan*, 778 F.2d at 1462; *see also United*

*States v. Freedberg*, 724 F. Supp. 851, 853 (D. Utah 1989).

Another public interest consideration considered by courts has been the presence

of accountability in the form of probation supervision.  In a case in which victims had

---

[13] United States v. Carrigan, 778 F.2d 1454, 1462 (10th Cir. 1985) (quoting United States v. Miller, 722 F.2d 562, 563 (9th Cir. 1983).

[14] *See, e.g.* United States v. Smith, 417 F.3d 483, 487 (5th Cir. 2005) ("A district court may properly reject a plea agreement based on the court's belief that the defendant would receive too light of a sentence."); In re Morgan, 506 F.3d 705, 712 (9th Cir.2007) (court must make an "individualized assessment" of the plea agreement).

[15] Jef Feeley and Janelle Lawrence, "Orthofix Medicare Fraud Probe Is Rejected Again by Judge," *Bloomberg Businessweek,* December 13, 2012.

[16] Jef Feeley and Janelle Lawrence, "Merck Unit's Plea over Vioxx Investigation Accepted by Judge," *Bloomberg Businessweek,* April 19, 2012.

intervened and objected, a federal court rejected a proposed "binding" plea agreement, noting "the public's interest in accountability," stating that the parties could submit a new agreement with probation and compliance requirements.[17] A year later, the court accepted a revised plea agreement, which unlike the initial version, provided for three years of supervised probation.[18]  Most corporations that plead guilty are placed on probation; a deferred prosecution agreement avoids formal probation supervision.  To provide for analogous accountability, as in the WakeMed and HSBC cases, courts have asked that monitoring and compliance reports be provided to the court.

In deciding whether to approve a deferred prosecution agreement, a court should conduct an individualized examination whether it is reasonable, fair, comports with the goals of the Sentencing Guidelines, and is in the public interest.  Indeed, for a deferred prosecution agreement, the role of a judge is less procedurally confined than it would be if Rule 11 formally applied.  The functional considerations raised by organizational deferred prosecution agreements and organizational pleas may be quite similar, except that the Sentencing Guidelines do not squarely apply to a deferred prosecution. Moreover, for a deferred prosecution agreement, there is no criminal judgment imposed to punish the alleged violations, and there is no probation supervision of the company.

**B.  Analogous Fairness and Reasonableness Review of Civil Settlements Can Inform Standards for Review of Deferred Prosecution Agreements**

The role of a court in reviewing a corporate deferred prosecution agreement also resembles what the court does in reviewing a civil consent or settlement agreement with

---

[17] U.S. v. Guidant LLC, No. 10-mj-67, 708 F.Supp. 2d 903, 921 (D.MN. 2010).
[18] "Judge Accepts Guilty Plea by Guidant," *Bloomberg News,* January 13, 2011; "Judge Adds Probation to Guidant Plea Deal," Associated Press, January 12, 2011.

an organization.  Under the federal civil rules, a class action settlement must be found "fair, reasonable and adequate," before it is given final approval. Fed.R.Civ.P. 23(e)(2).  In that context, the rule reflects due process concerns with the effects of a settlement on non-participating class members, including the need to avoid potential intra-class conflicts, preferential treatment of certain class members over others, or inadequate representation.  Courts have elaborated further considerations regarding the complexity of the case, the participation of government litigants, and the reaction of class members.  *See, e.g.* Hanlon v. Chrysler Corp, 150 F.3d 1011, 1026 (9th Cir. 1998).  The fairness concerns in the context of a criminal prosecution are different because adequacy of representative is not applicable although an analogous concern – the interests of victims – may be implicated.

There are certain similarities with the inquiry in which a court decides whether or not to approve a civil consent decree based on whether it is "fair, reasonable, and consistent" with the purposes of the laws or regulations, and if injunctive relief is part of the relief, [whether] the "public interest would not be disserved," *eBay, Inc. v. MercExchange,* 547 U.S. 388, 391 (2006).[19]  Review of consent decrees is necessarily highly deferential, but a court must consider the public interest and the sources of underlying law.[20]  As one court has put it, "when the district judge is presented with a proposed consent judgment, he is not merely a 'rubber stamp.'" *S.E.C. v. Levine,* 881 F.2d 1165, 1181 (2d Cir.1989).

---

[19] S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir.1984) ("Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved.").
[20] *See, e.g.* Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) ("[A] federal consent decree must . . . further the objectives of the law upon which the complaint was based.")

As the Second Circuit recently emphasized: "The primary focus of the inquiry, however, should be on ensuring the consent decree is procedurally proper." *S.E.C. v. Citigroup Global Markets, Inc.*, 752 F.3d 285, 289 (2d Cir. 2014). That case, finding that a district court abused its discretion in declining to approve an SEC consent decree, focused on the court's findings that the "truth" of certain allegations were not established. *Id*. at 295. The Second Circuit did emphasize that the court must find a "factual basis" for such a decree, a requirement that mirrors the requirement of a factual basis for a plea agreement. *Id*. at 295.

In addition, because the fairness and reasonableness of a consent decree may require input by non-parties, public participation and defined procedures are required for a range of civil agreements that raise issues of public importance. Several federal agencies must permit notice and comment from the public before they enter into consent decrees regarding certain federal statutes.[21] Further, in civil actions filed by agencies, third parties potentially affected by a consent decree may participate in a fairness hearing before court approval.[22] One real concern regarding deferred prosecution agreements is that they avoid participation by the public, and in particular, notice to victims and participation of victims, which would typically be required for a case resulting in a plea under the 2004 Crime Victim's Rights Act.[23] Restitution to victims may be mandatory

---

[21] *See, e.g.,* Tunney Act, 15 U.S.C. § 16(b) (2000); 16 C.F.R. § 2.34(c) (2006) (FTC consent orders); Clean Water Act, 33 U.S.C. § 1319(g)(4) (2000); Safe Drinking Wa- ter Act, 42 U.S.C. § 300h-2(c)(3)(B) (2000); 40 C.F.R. § 22.45 (2006) (Environmental Protection Agency ("EPA") public notice requirements); CERCLA, 42 U.S.C. § 9622(d)(2) (2000).

[22] *See* Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 529 (1986).

[23] 18 U.S.C. § 3771. For an unusual case in which alleged victims were notified of the proceedings and participated, where the parent entered a deferred prosecution agreement to which those third-parties unsuccessfully objected, see Transcript of Change of Plea and Sentencing Hearing, 17, 22, United States v. Alcatel-Lucent*, Case No. 1:10-cr-20907-MGC (S.D. Fla. June 1, 2011); In re: Instituto Costarricense de Electricidad, No. 11–12708-G (11th Cir. 2011) (unpublished decision). On the concept of "notice and

under the relevant statutes, and it is prioritized under the Organizational Sentencing Guidelines should there be an "identifiable victim" in the case.  In that situation, there may be a real concern that diversion could avoid considering the need for restitution.[24]

## C.  Review of Deferred Prosecution Agreements Additionally Implicates Supervisory Authority over their Future Implementation

A deferred prosecution implicates a court's case management authority at a preliminary stage in a case, before any judgment is anticipated and in which no judgment is likely should the agreement be satisfactorily completed. A court may become involved in disputes over the meaning and consequences of a deferred prosecution agreement. Carefully reviewing such an agreement to avoid any unnecessary disputes can help to prevent their occurrence.

An inherent supervisory power may provide further authority to not only decide whether to approve such an agreement, but also to supervise its implementation, within appropriate limits. In the HSBC case, Judge Gleeson held that because the parties had decided to "place a criminal matter on the docket of a federal court," the court retained its inherent supervisory power to ensure that it did not "so transgress the bounds of lawfulness or propriety as to warrant judicial intervention to protect the integrity of the Court."  HSBC Order at *6.  As the Supreme Court has explained: "The supervisory power . . . permits federal courts to supervise 'the administration of criminal justice' among the parties before the bar."[25] Maintaining judicial integrity may be of relevance to

comment" sentencing, see Richard A. Bierschbach and Stephanos Bibas, "Notice-and-Comment Sentencing," 97 *Minnesota Law Review* 1 (2012).
[24] *See, e.g.* The Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3663; 18 U.S.C. § 3663A; *see also* U.S.S.G. § 8B1.1(a) (in a case with an "identifiable victim" the court shall "enter a restitution order for the full amount of the victim's loss")..
[25] United States v. Payner, 447 U.S. 727, 735 n.7 (1980) (quoting McNabb v. United States,318 U.S. 332, 340 (1943)).

deferral of a prosecution.  To be sure, as Judge Gleeson noted, "In the typical supervisory

power case, the defendant raises a purported impropriety in the federal criminal

proceeding and seeks the court's redress of that impropriety."  HSBC Order at *6.

From time to time, however, courts have had to interpret the terms of deferred

prosecution agreements and determine whether there had been a breach.[26]  Whether

interpreting the terms of an agreement due to an allegation of a breach, or deciding

whether ultimate dismissal of a deferred prosecution agreement is appropriate, any

review would be deferential to the terms agreed upon by the parties.[27]  Of course, most

corporate deferred and non-prosecution agreements, like the proposed Saena Tech Corp.

agreement, provide prosecutors with "sole discretion" whether to declare a breach.

Prosecutors have very rarely invoked that type of provision.  Such a provision, if it were

to be arbitrarily invoked, could raise due process concerns.  Courts are divided, however,

on whether pre-indictment remedies are appropriate for an alleged breach.[28]  In the HSBC

case, Judge Gleeson also noted: "it is easy to imagine circumstances in which a deferred

prosecution agreement, or the implementation of such an agreement, so transgresses the

bounds of lawfulness or propriety as to warrant judicial intervention to protect the

integrity of the Court" and, amicus would add, the defendant. HSBC Order at *6.

---

[26] *See, e.g.* United States v. Hicks, 693 F.2d 32, 33 (5th Cir. 1982), cert. denied, 459 U.S. 1220
(1983) ("The diversion agreement is a contract.... The [district] court was entitled to hear evidence on the
violations to make sure that the government had lived up to its side of the bargain.")  *See also* U.S. v.
Foster, 823 F.Supp. 884, 886 (D. Kan. 1993).  For the proposition that a diversion agreement, if ambiguous,
should be construed against the drafter, see United States v. Allen, 683 F.Supp. 1136, 1139
(E.D.Mich.1988). For the principle that a defendant be prejudiced as a result of reliance on such an
agreement, *see* United States v. Garcia, 519 F.2d 1343, 1345 (9th Cir.1975).
[27] U.S. v. KPMG, LLP, 2007 WL 541956, No. 05 CR. 903(LAP) (S.D.N.Y., Feb. 15, 2007) (noting "the
very limited scope of judicial inquiry permitted under Rule 48(a), and the presumption of good faith on the
part of the Government in seeking dismissal of charges.")
[28] United States v. Meyer, 157 F.3d 1067, 1076–77 (7th Cir. 1998); United States v. Verrusio, 803 F.2d
885, 888 (7th Cir. 1986); compare Stolt-Nielsen, S.A. v. United States, 442 F.3d 177, 187 (3d Cir. 2006).

While amicus agrees that the role of the Court is both important and limited, amicus has argued that this review can be informed by relevant standards in analogous areas, and by an analysis of questions that uniquely arise in a corporate prosecution, but not in the deferral of an individual case.  The complexity of corporate deferred prosecution agreements and their public importance provides all the more reason to conduct a careful individualized review of the fairness and reasonableness of organizational deferred prosecution agreements before approval.  Doing so may safeguard the public interest, as with the judicial review of plea agreements and civil settlements, and judicial review may also avoid unnecessary disputes during the implementation of a deferred prosecution agreement with an organization.

Respectfully Submitted,

__ /s/Alan B. Morrison_____                    __ /s/Brandon L. Garrett____

Alan B. Morrison                                 Brandon L. Garrett
Counsel for Amicus                               N.Y. State Bar No. 4094033
George Washington University                     University of Virginia School
   Law School                                of Law
2000 H Street NW                                 580 Massie Road
Washington D.C. 20052                            Charlottesville, VA 22903
202 994 7120                                     434 924-4153
abmorrison@law.gwu.edu                           bgarrett@virginia.edu

August 22, 2014